**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| CAMERON FOBBS | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Case No.: 3:21-cv-26 |
| | : **JURY TRIAL DEMANDED** |
| | : |
| MAJOR ROMEL HUNT, | : |
| | : |
| SERGEANT BRANCH, | : |
| | : |
| JOHN DOE(S) CORRECTIONAL OFFICERS | : |
| | : |
| Defendants. | : |

## COMPLAINT

Plaintiff Cameron Fobbs, by counsel, moves for judgment against Defendants Major Romel Hunt, Sergeant Branch, and John Doe(s) Correctional Officers.

## INTRODUCTION

1.      This case arises out of Defendants' brutal and lawless act of unnecessary force and collective punishment taken against Residents of Pod 5G at the Richmond City Justice Center ("RCJC") as a direct response against Residents for raising concerns about the institution's failure to follow COVID-19 protocols.

2.      As described in further detail below, COVID-19, also known as the coronavirus, spread throughout the RCJC largely uncontrolled throughout the summer of 2020. Upon information and belief, infection rates inside the RCJC were up to six times higher than the average infection rate in Virginia.

3.      Fearing for their lives due to the uncontrolled spread of COVID-19, residents complained to correctional officers about the conditions of their confinement and demanded

1

answers regarding the RCJC's protocols for controlling the spread of the virus. Specifically, on August 29, 2020, Residents of Pod 5G complained to Defendants that other residents of the RCJC who had known COVID-19 exposures had been transferred into Pod 5G without testing negative for the virus and without undergoing the Virginia Department of Health and CDC quarantine period.

4.    Rather than properly address these valid concerns, Defendants responded to the inmates' and detainees' nonviolent and legitimate grievances with an unnecessary act of cruelty – using tear gas intended only for outdoor crowd control on the Residents of Pod 5G, many of whom were locked in their cells and trapped without fresh air or water for hours before the gas dispersed. This action was unnecessary, illegal, unconstitutional, and done in flagrant disregard of the inmates' and detainees' First, Eighth, and Fourteenth Amendment rights.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction under 28 U.S.C. § 1331 and under 28 U.S.C. § 1343(a)(3). The controversy arises under 42 U.S.C. § 1983 and under the First, Eighth, and Fourteenth Amendments of the U.S. Constitution.

6.    This Court has supplemental or pendant jurisdiction over this case under 28 U.S.C. § 1367(a).

7.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2). All Defendants reside in this district or have this district as their permanent operating location. The Richmond City Justice Center, in which the actions and deprivation of rights alleged herein occurred, is located within the Eastern District of Virginia and within the Richmond Division.

## PARTIES

8.      Plaintiff Cameron Fobbs, for all relevant times, was a detainee at the Richmond City Justice Center.

9.      Plaintiff intends to seek class certification on behalf of all residents of Pod 5G as of August 29, 2020, both inmates and detainees. The persons housed in Pod 5G are hereinafter referred to as "Residents."

10.      Defendant Major Romel Hunt ("Defendant Hunt") is a major with the Richmond Sheriff's Department. Defendant Hunt is responsible for managing and overseeing other correctional staff at the RCJC. Defendant Hunt is sued in his individual capacity.

11.      Defendant Sergeant Branch ("Defendant Branch") (first name unknown to Plaintiff) is a sergeant with the Richmond Sheriff's Department. Defendant Hunt is responsible for managing and overseeing other correctional staff at the RCJC. Defendant Branch is sued in his individual capacity.

12.      Defendants John Doe(s) Deputies are currently unknown individuals who worked as correctional officers at the RCJC. John Doe Deputies are sued in each of their individual capacities.

13.      All Defendants, for all times relevant to this Complaint, were acting under color of state law.

## CLASS ACTION ALLEGATIONS

14.      Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of one Class – all persons incarcerated in Pod 5G during the August 29, 2020 tear gassing; and two subclasses – pre-trial detainees on Pod 5G and post-conviction inmates on Pod 5G.

3

A.     **Numerosity Pursuant to Fed. R. Civ. P. 23(a)(1)**: Upon information and belief, Plaintiff alleges that Class members are so numerous that joinder of all is impractical. Joinder in this matter is particularly impracticable because a majority of the members of the proposed Class remain incarcerated, making it nearly impossible for each of them to retain counsel and bring individual actions on their own behalf. There were between 50 and 100 inmates and detainees living on Pod 5G at the time of the gassing. Documents maintained by Sheriff Irving will identify which specific individuals belong to the class.

B.     **Common Questions of Law and Fact Pursuant to Fed. R. Civ. P. 23(a)(2)**: In this action, Plaintiff alleges that all inmates and detainees suffered a violation of their rights as a result of the gassing, which amounted to cruel and unusual punishment and an act of collective punishment in violation of the Eighth and Fourteenth Amendments. Common questions of law and fact include, among other things:

      i.     Whether Defendants retaliated against the residents of Pod 5G as a direct response to their grievances regarding the RCJC's policies and procedures regarding COVID-19.

      ii.     Whether Defendants acted reasonably in tear gassing the entire Pod as a result of a small minority of inmates peacefully refusing to reenter their cells.

      iii.     Whether Defendants' use of tear gas authorized only for outdoor crowd control in an indoor environment with little to no fresh air

ventilation was a reasonable or necessary use of force, or whether the use of force had any legitimate penological purpose.

C. **Typicality Pursuant to Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the claims of each Class member. Plaintiff would only seek individual or actual damages if class certification is denied. Plaintiff is entitled to the same types of relief as any other member of the proposed Class. Although Pod 5G housed detainees, entitled to relief pursuant to the Fourteenth Amendment, and inmates, entitled to relief pursuant to the Eighth Amendment, the type of relief and the standards for determining each member's entitlement to such relief are similar regardless of whether the Class member is a pre-trial detainee or a post-conviction inmate. *See e.g. Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (describing that pre-trial detainees' rights pursuant to the Fourteenth Amendment are at least as strong as the protection afforded to an inmate pursuant to the Eighth Amendment). To the extent that the legal standard may differ for each Class member based upon whether he is a pre-trial detainee or a post-conviction inmate, Plaintiff proposes that the Class members be divided into two subclasses – pre-trial detainees and post-conviction inmates.

D. **Adequacy Pursuant to Fed. R. Civ. P. 23(a)(4)**: Plaintiff is an adequate representative of the Class because his interests coincide with, and are not antagonistic to, the interests of the members of the Class he seeks to represent. Plaintiff and his Counsel will fairly and adequately protect the interests of all members of the proposed Class.

15.    This action has been brought, and may properly be maintained, as a class action under federal law.  It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under federal Rule of Civil Procedure 23, and it satisfies the requirements for certification under Rule 23(b) or, in the alternative, 23(b)(1).

16.    Counsel for Plaintiff know of no conflicts among proposed class members or between counsel of proposed class members.

17.    Defendants have acted on grounds generally applicable to all proposed class members.  Plaintiff therefore seeks certification under Rule 23(b)(2).

18.    In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the proposed classes.

## FACTUAL ALLEGATIONS

### A.    The Spread of Coronavirus at the RCJC

19.    Since the beginning of 2020, like most of the world, the United States has been struck by a significant outbreak of COVID-19, a novel coronavirus that spreads quickly and can have devastating, sometimes deadly, effects on those who contract it.

20.    The coronavirus has spread more quickly in jails and prisons throughout the United States.

21.    The RCJC, like many other correctional facilities, has suffered from severe outbreaks of the coronavirus among its residents.

22.     Sheriff Irving and all other employees of the Richmond Sheriff's Office have been informed by State and Federal agencies that correctional facilities present a stronger than normal hazard for the spread of the virus.

23.     Residents of the RCJC have similarly become aware that the RCJC is an environment where the coronavirus can spread quickly.

24.     Residents of the RCJC are aware that there is little they can do for themselves to prevent the spread of the coronavirus. Instead, they are reliant upon correctional officers to implement policies to protect them and slow the spread of the virus.

25.     Inside the RCJC, however, Defendants were deliberately indifferent to the risk posed to residents at the RCJC who were or could have been exposed to COVID-19. This led to large scale outbreaks of COVID-19 in the RCJC (at one point in time, there were over one hundred cases at the RCJC).

26.     The following are illustrative, non-exhaustive examples of Defendants indifference to the health and safety of detainees at RCJC that were experienced by members of the Classes at the RCJC:

      i.    Defendants chose not to follow CDC isolation and quarantine of contacts protocols of suspected cases. For example, although an individual on a pod who tested positive for the coronavirus may have sometimes been removed from the pod, the individual's cellmate was required to remain in the general population – despite having had prolonged and close contact with a positive coronavirus case and contrary to CDC guidelines.

      ii.    Defendants chose to allow residents who displayed symptoms of the coronavirus to remain in the general population despite their repeated

complaints to guards that they were unwell. At least one inmate who would be a part of the proposed Class, Gilberto DeJesus, repeatedly told correctional officers that he was unwell and experiencing COVID-19 symptoms like tightness in his chest and fatigue. He was forced to remain with the general population. This practice created an unnecessary risk of viral infection for other residents and is contrary to CDC guidance, which specifies that anyone with coronavirus symptoms should be allowed to self-quarantine to protect others.

iii. Defendants chose not to enforce mask-wearing within the jail. Defendants and other correctional officers took their masks off to speak to Residents and other inmates, defeating the purpose of mask-wearing. Speaking and yelling indoors, without a mask, are high-risk activities which contribute significantly to the spread of the coronavirus. The RCJC's policy of non-enforcement significantly contributed to the ongoing risk of another coronavirus outbreak in the Jail.

iv. Defendants chose not to follow proper surface sanitation procedures to prevent the spread of the coronavirus. Rather than ensuring that all surfaces were cleaned between use by residents, several residents were allowed to use equipment like telephones and microwaves before they were cleaned and sanitized. The lack of sanitation of this type of equipment has been identified by the CDC as a risk factor to coronavirus infection

27.    Defendants' lackadaisical approach to coronavirus control procedures previously resulted in at least one severe coronavirus outbreak. In the late part of the summer, over 100 inmates were quarantined after testing positive for COVID-19.

28.    It is likely that RCJC's true infection numbers were even higher than that figure, as inmates' close contacts were not allowed to quarantine, and inmates and detainees who tested negative but later displayed coronavirus symptoms were not treated.

**B.    The Unconstitutional and Non-Penological Use of Tear Gas and Pepper Spray Inside Pod 5G.**

29.    As described, in August 2020, the spread of coronavirus at the RCJC was not under control.

30.    Sheriff Antoinette Irving ordered that inmates be separated into a "quarantine pod" for those who tested positive for the virus and a "negative pod" for those who tested negative. Pod 5G was a "negative pod."

31.    It was known both to Defendants and to Residents of Pod 5G that coronavirus can spread without a resident receiving a positive test result. In particular, it was well known that coronavirus might spread through close contact with persons who had tested positive and that it might spread when a new resident is admitted to the jail without being tested.

32.    Contrary to policy and plans for pandemic related monitoring, isolation, and quarantining in order to prevent spread and protect residents from the serious health risk, the RCJC made little or no effort to quarantine close contacts of inmates who were transferred off the Pod after testing positive. Close contacts of positive inmates, including their cellmates, continued to be housed on Pod 5G. They were denied further tests or temperature checks to monitor their risk to Residents on the Pod.

33.    Residents who felt ill after testing had concluded were not allowed to self-quarantine or repeat the test which had been administered. As they developed symptoms, the RCJC required them to continue their normal activities and circulation among the other inmates.

34.    Contrary to its stated policy, the RCJC continued to transfer new people onto the Pod from other pods. Several of the new transfers had been quarantined prior to transfer for less than the requisite fourteen-day period; several of them had been quarantined for seven days or less prior to their transfer. Nevertheless, they were housed on the Pod and continued to circulate among the prior population.

35.    On the night of August 28, 2020, Gilberto DeJesus, who had been recently moved onto Pod 5G, began to feel ill. He verbalized his symptoms with John Doe Deputies who were staffing the Pod that evening. Mr. DeJesus was concerned that he had contracted COVID-19 in the jail and would pass it on to his cellmate. He had not been allowed to quarantine for the suggested 14-day period before beginning his transfer to Pod 5G. As such, he asked John Doe Deputies to allow him to quarantine alone, in segregation if necessary. His request was denied.  He continued to experience coronavirus symptoms overnight while in Pod 5G.

36.    Another inmate who had tested positive for COVID-19 had been moved into quarantine, but his former cellmate remained in the pod among other inmates. The cellmate attempted to quarantine alone inside his cell, as John Doe Deputies did not respond to repeated complaints from residents about the infection risk.

37.    In light of John Doe Deputies' failure to properly quarantine symptomatic and infected residents in combination with other failures by Defendants to take basic steps to reduce or minimize transmission described in the Paragraphs above, Residents on Pod 5G became increasingly concerned about their health and safety.

38.     Consequently, a group of Residents on Pod 5G told Defendants Doe, Hunt, and Branch that they were concerned about the adequacy of RCJC's infection control procedures.

39.     By the time that the residents on Pod 5G organized as a group to verbally request that correctional officers better contain the spread of COVID-19, numerous residents had already complained individually, to no result. As described above, multiple residents of 5G had informed correctional officers that they had been exposed to coronavirus or that they were experiencing symptoms. Despite the numerous concerns that had been expressed, Defendants did not take any actions to address those concerns.

40.     The group requested information on their testing status and asked jail authorities why individuals who were symptomatic, or had been close contacts of positive inmates, were not under a self-quarantine. During these conversations, the vast majority of 5G Pod Residents were in their cells; most 5G Pod Residents remained in their cells as concerns were escalated up the Jail's chain of command.

41.     Throughout the evening, a group of Residents escalated their concerns upward through the jail chain of command: they spoke first with Defendant Branch who managed the floor, then those John Doe Defendants who were superior to Defendant Branch. None of these officials answered the Residents' questions about their testing status, nor did they provide details of the RCJC's plan to contain the ongoing coronavirus outbreak. Eventually, all officials left the Pod, closing the door to the entry sallyport behind them.

42.     After all correctional staff left the Pod, they used the intercom system to tell the inmates that the jail was going into lockdown. Lockdown meant that all inmates were required to enter their cells so that the cells could be locked.

43.     The majority of residents on Pod 5G complied with the lockdown order and returned to their cells as requested. A minority of residents remained outside of their cells in the public area of the Pod. The inmates who remained outside of their cells expressed that they were not satisfied with the lack of answers regarding COVID-19 and were remaining outside of their cells in order to attempt to achieve better communication with Defendants.

44.     Upon information and belief, residents on Pod 5G were generally aware of the RCJC's ordinary response to a refusal to enter a cell during lockdown. Residents had observed in the past that refusal to enter one's cell would result in individual detainment by a correctional officer, the use of pepper spray only if physically resistant, and removal from the Pod to segregation. As many residents wanted to avoid contracting COVID-19, they expressed through the intercom that they would voluntarily go to segregation.

45.     Approximately 15-30 minutes after the lockdown order had been given, correctional officers had taken no action against the residents who remained outside of their cells.

46.     Eventually, correctional officers locked the cell doors so that those inside their cells could not leave and those outside of their cells could not enter their cells, even if they decided that they would comply with the lockdown order.

47.     Correctional officers then used the intercom system again to tell the residents to go into lockdown. Being unable to enter their locked cells, Defendant Doe(s) ordered the residents to stand next to their cells.

48.     Perceiving that they were allowed to stand outside of their cells - rather than go inside and the cell and be exposed to their cellmates - the residents who had previously refused to comply each went to stand next to their cells.

49.    At this time, all or nearly all of the Residents on Pod 5G had complied with the officers' orders to the best of their ability. No Resident of Pod 5G threatened violence against Defendants or any other correctional officers at any time.  There were no correctional officers physically inside the Pod. Accordingly, there was no inmate, detainee, jail employee, or any other person in any physical danger.

50.    During the time that had passed since some Residents had initially refused to go into their cells, Defendants Branch, Hunt, and Doe(s) planned and prepared an assault on Pod 5G in retaliation for the noncompliance of some of the Residents.

51.    By the time that Defendants were prepared for the assault on Pod 5G all Residents of the Pod were either inside their locked cells or standing next to their cells.

52.    Despite the calm environment within the Pod, Defendants assaulted and poisoned all residents of Pod 5G. Defendants Hunt and Branch, among other John Doe Deputies, participated in the assault.

53.    Defendants were subjectively aware that there was no legitimate penological purpose in using indiscriminate chemical weapons against the Residents of Pod 5G. The purpose of the assault upon Pod 5G was to indiscriminately punish, and poison, the Residents for their peaceful protest against the RCJC's failure to provide adequate protection from the spread of coronavirus.

54.    Defendants began the assault by rolling tear gas cannisters through the tray slots in the entrance doors.

55.    The entire Pod almost immediately filled with gas. With the majority of the Residents locked in their cells, the Residents had nowhere to escape the gas and breathe fresh air.

56.    Those Residents who had remained outside their cells attempted to escape the gas by rushing through one of the cell doors which remained open. Six residents rushed to enter the single open cell as tear gas made its way through the pod, causing inmates to cough on each other as they struggled to breathe.

57.    One Resident recalls seeing guards walk up to the cell filled with inmates and spraying pepper spray on them all before shutting the cell door and leaving them to suffer in the gas and pepper spray.

58.    Other residents, such as Plaintiff, all trapped in their cells, immediately struggled to breathe.

59.    Residents trapped in their cells attempted to breathe by putting their mouths up to the air vents in their cells. They quickly learned that Defendants had turned off the ventilation system for Pod 5G and that no air was flowing through the vents.

60.    The Residents attempted to soothe their burning skin by using water from their sinks, only to find that there was no water pressure.

61.    Without any ventilation, the gas was unable to disperse and settled into the cells. The residents were unable to escape, clean themselves of the poison, or get any fresh air.

62.    The specific chemical compound used in the gassing is scientifically known as 2-chlrobenzalmalononitrile, but is commonly referred to "CS gas" or "CS smoke."

63.    Following the gassing, residents on Pod 5G observed a label on one of the gas canisters, which identifies the chemical as "5231 Riot CS Smoke Triple-Phaser," and bears a specific warning written in all capital letters: "FOR OUTDOOR USE ONLY."  This is a picture of the actual label from a canister used in the attack on 5G:



64.    The warning label on the CS gas also has a "first aid" section, which stated that those exposed to the gas should "seek medical assistance as soon as possible," remove any "contaminated clothing," wash their skin with clean water, and expose their eyes to fresh air.

65.    The chemical irritant active in CS gas activates pain receptors on the skin, causing a burning sensation for all those exposed directly to the gas. Tear gas works by irritating the lungs, mouth, throat, and skin; its major pathway to disrupting normal respiratory patterns is through the lungs. CS gas causes coughing, sneezing, and difficulty breathing as it irritates the respiratory organs. The CDC recommends that people exposed to CS gas immediately vacate buildings in which it has been released due to the risk of serious and long-term damage to the eyes and lungs. Residents were not allowed to leave their unventilated cells after immediate exposure.

66.    Because it is such a dangerous chemical agent, the RCJC has a Use of Force policy that governs the use of "less lethal weapons," such a as tear gas. The Use of Force policy limits the use of Riot CS Smoke to situations where an imminent risk of physical harm is present, and specifically states that these agents will not be used "indiscriminately to control or disperse a crowd."

67.    No degree of force was warranted under these circumstances.

68.     RCJC officers, including all Defendants, knew by virtue of their training and written policy that the use of CS gas was not warranted under the circumstances and no objectively reasonable RCJC officer would have believed he or she had a legal justification to deploy CS gas in Pod 5G.

69.     During their time trapped in the CS gas in Pod 5G, multiple Residents described that they felt they were going to die in the gas. Indeed, the CDC advises that long-lasting exposure in a closed setting may cause immediate death due to severe chemical burns to the throat and lungs or respiratory failure resulting in death.

70.     After some time, officers began to remove residents from the Pod one by one. This took up to thirty minutes, during which time residents were given no relief from the effects of the tear gas.

71.     Residents on Pod 5G were filed out to the RCJC's recreation yard, where they stood for approximately 30 minutes to one hour. Residents were vomiting and coughing severely, and continued to struggle to catch their breath. Most residents were not ever seen by a medical professional after exposure to the chemical irritants. Those who went without medical care include residents with asthma and other pre-existing respiratory conditions for whom indoor tear gas exposure is particularly dangerous.

72.     When the residents returned to their cells, they were immediately placed on a lockdown that lasted for several days. Residents were not allowed to shower immediately; several Residents, including Plaintiff, were made to wait as long as four days to take a shower. During this time, the chemical irritants in the tear gas and pepper spray continued to burn their skin, causing extreme discomfort and psychological distress.

73.     All of the Residents of Pod 5G experienced unnecessary pain and suffering as a result of the assault on Pod 5G.

74.     As a result of this incident, Plaintiff continues to experience stress and fear. Upon information and belief, many members of the proposed Class remain concerned that any action by them – or no action at all – will result in further torture and suffocation by Defendants.

## EXHAUSTION AND PLRA INAPPLICABILITY

75.     The PRLA requires that inmates exhaust all available administrative remedies before filing an action in federal court. However, an administrative remedy may be considered unavailable (and thus inapplicable under the PRLA's exhaustion provision) in one of three circumstances: "(1) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is so opaque that it becomes, practically speaking, incapable of use; or (3) prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Woodson v. Duncan*, 741 Fed. Appx. 177, 178 (4th Cir. 2018); *Germain v. Shearin,* 653 Fed. Appx. 231, 232-33 (4th Cir. 2016).

76.     Threats by prison administrators may render an administrative remedy unavailable for purposes of the PRLA when: (1) the threat actually did deter the inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of "ordinary firmness and fortitude" from lodging a grievance or pursuing a particular part of the process. *Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008); *see also Kaba v. Stepp*, 458 F.3d 678, 684-85 (7th Cir. 2006); *Hemphill v. New York*, 380 F.3d 680, 689 (2d Cir. 2004).

77.     As detailed above, Defendants displayed a consistent pattern of abject indifference towards the health and safety of inmates at the RCJC with respect to the serious risk of COVID-19 at the facility and by intentionally poisoning them.

78.     As further detailed above, on August 29, 2020, numerous residents on Pod 5G verbalized their concerns regarding Defendants' failure to follow adequate safety to procedures to prevent the spread of COVID-19. Despite these residents' attempts to escalate their concerns up through the jail's chain of command, Defendants were either unable or unwilling to address their concerns in any meaningful way.

79.     After refusing to address the Residents' concerns, Defendants imposed a lockdown on Pod 5G, ordering the Residents to return to their cells so that the doors to the cells could be locked. The majority of Residents complied with these orders, while several refused to comply due to Defendants refusal to address their pressing and legitimate concerns regarding the spread of COVID-19 within the facility.

80.     As detailed above, Defendants retaliated against these inmates' entirely reasonable demands that their concerns be addressed with shocking and unconstitutional brutality. Specifically, Defendants released tear gas and other chemical irritants into Pod 5G, causing the residents to choke, gasp for breath, and cough violently. Many residents even fell unconscious as a result. Defendants deliberately deployed these chemical irritants against residents who had in fact complied with the lockdown orders.

81.     Defendants' disproportionate and excessive response of releasing these chemical irritants is made all the more shocking in light of the ongoing outbreak of COVID-19 at the RCJC, given that COVID-19 is a highly infectious respiratory virus which is known to be spread through respiratory droplets produced from coughing and sneezing.

82.    As a result of Defendants' brutal and malicious retaliation against the Residents on Pod 5G, residents are reasonably terrified of pursing any of the administrative remedies which may be otherwise available at the RCJC in order to seek redress for their grievances. On at least one instance in which a Class Member filed a grievance, he was subjected to retaliation and was placed in the segregation unit without a charge for several days. Those Class Members who have overcome significant intimidation to file grievances have seen no response or explanation for Defendants' actions.

83.    It is inarguable that Defendants' decision to deploy tear gas and chemical irritants, during a deadly pandemic, in response to the Residents' demands that their concerns be addressed is conduct which would "deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing a particular part of the process."

84.    Thus, Defendants' unconstitutional conduct constitutes a threat which renders any potential administrative remedy at the RCJC unavailable to Residents for the purposes of the PRLA. As such, the PRLA's exhaustion provision is inapplicable to Plaintiff's claims, because there are no available administrative remedies for Residents to exhaust.

### Count I: Retaliation to Inmate/Detainee Speech
### in Violation of the First Amendment
### 42 U.S.C. § 1983

85.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

86.    Based on the facts alleged above, Plaintiff asserts that the Defendants have violated their First Amendment right to petition Defendants for a redress of grievances.

87.    Those confined to facilities such as the RCJC do not lose their First Amendment right to issue complaints to their government and its agents.

88.    Plaintiff and other members of the proposed Class specifically allege that Defendants' use of force was an act of direct retaliation against the residents of Pod 5G standing up for their rights to request medical treatment and other information related to COVID-19.

89.    Defendants would not have used such excessive force against Plaintiff and the Proposed Class members in ordinary circumstances. The use of excessive force was in direct retaliation to the Residents' expression of legitimate grievances.

90.    Plaintiff asserts that the force used would have substantially differed absent a retaliatory motive held by Defendants.

91.    Proposed Class members' grievances regarding COVID-19 was certainly a motivating factor in Defendants' decision to use extraordinary and unnecessary force.

92.    Defendants' actions acted as a direct attempt to suppress complaints by the Residents of Pod 5G and discourage them from stating their grievances.

93.    The response by Defendants was a direct act of collective punishment against the residents of Pod 5G for their assertion of their rights and therefore constitutes a direct violation of the First Amendment.

**Count II: Use of Excessive Force**
**in Violation of the Eighth, and Fourteenth Amendments**
**42 U.S.C. § 1983**

94.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

95.    Based on the facts alleged above, Defendants violated Plaintiff's and the other Residents' Eighth/Fourteenth Amendment rights by using excessive force to unnecessarily and wantonly inflict pain without penological justification.

96.    Defendants' deployment of CS gas was not a good faith effort to restore discipline and order but was used sadistically for the very purpose of causing harm as demonstrated by,

among other things, that: a. Defendants acted with force greater than necessary to escort Residents standing next to their locked cells to enter their cells; b. Defendants failed to institute a policy to minimize the effects of CS gas to Resident bystanders; c. Defendants used force indiscriminately when they had knowledge that CS gas had infiltrated the ventilation system and affected Residents that were locked in their cells and posed no threat and yet left these prisoners in their cells for 30 minutes; d. Defendants cut off water and ventilation to the cells; e. Defendants prevented Residents from showering the burning gas off of their skin and accessing medical care for several days after they were poisoned.

97.     The use of tear gas against Plaintiff and Residents inflicted unnecessary and wanton pain and suffering. The deployment of the gas was unnecessary because Residents had engaged in no conduct that would require the use of chemical agents. Most inmates on Pod 5G were locked down in their cells at the time of the incident; those who were not were simply asking the Defendants questions about their policies regarding the novel coronavirus. There was no penological justification for the use of tear gas in this situation because the necessary predicate conduct justifying a penological response had not occurred. The wanton and indiscriminate use of harmful respiratory irritants is cruel and unusual in ordinary circumstance, banned even in warfare under the Chemical Weapons Convention; it is certainly cruel and unusual to use such equipment during a dangerous respiratory pandemic.

98.     The only use of force that could possibly be justified against residents who had peacefully refused to reenter their cells is individual force against the individual refusing residents. The use of force against the entire cell block, including against compliant residents such as Plaintiff, constitutes collective punishment in violation of the Eighth and Fourteenth Amendments.

99.    The force deployed was disproportionate and unnecessary to maintain order in several ways. First, the force deployed created a substantial risk of harm of which the officers were aware. The particular canister of tear gas used, the CTS 5231 Riot CS Smoke Triple-Phaser, bears several safety warnings on its outside label. The user is warned that the equipment is "for outdoor use only," that people exposed to the tear gas should "seek medical assistance as soon as possible," and that skin and clothing exposed to the chemical tear gas should be washed with water. This high level of risk – exacerbated by the conditions of an ongoing respiratory virus outbreak in the RCJC – when balanced against the very minor nonviolent request for protection from COVID-19 against which it was deployed, speaks to the extent to which Defendants' actions were outside the constitutional norms prescribed for the treatment of prisoners.

100.    Second, the tear gas and mace were deployed maliciously and sadistically to cause harm. After Defendants filled the unventilated pod with tear gas, residents desisted in their conduct and entered a cell. At this time, order had been restored, and whatever  arguable purpose that could have justified the use of force had been accomplished. Defendants, by continuing to pepper spray residents who had desisted in their noncompliance, demonstrated their purpose to inflict unnecessary harm upon residents without justification. Likewise, by denying Residents the opportunity to shower or consult with medical professionals after they were poisoned and maced, Defendants demonstrated that the use of these weapons was intended maliciously to cause harm, not to accomplish a legitimate penological purpose.

101.    Further, the risks and probable harm resulting from Defendants' conduct were such that no reasonable officer could have failed to understand the unconstitutionality of his or her conduct.  The risks to Plaintiff's health arising from Defendants' actions are so obvious and so dire that it should have been evident to any officer that the use of tear gas in this situation was

violative of the law.  The labeling of the tear gas itself served to put Defendants on notice of the dangers inherent in their conduct: Defendants were in fact on notice that the use of these weapons in an unventilated indoor space was likely to cause disproportionate and unconstitutional harm.

102.    The deployment of tear gas intended only for outdoor use was objectively unreasonable and not related to any legitimate nonpunitive governmental purpose.

103.    Defendants were subjectively aware that deploying tear gas to the entire Pod was unreasonable, unnecessary, cruel, unusual, and an act of collective punishment.

104.    Plaintiff continues to suffer from the negative effects of Defendants' conduct. The full effect of the gassing on Plaintiff remains uncertain as Plaintiff and other proposed class members have been unable to obtain adequate medical care since the gassing. Residents of Pod 5G continue to report increased anxiety as a result of the unprovoked use of tear gas and continued fear that similar tactics will be used in the future.

## PRAYER FOR RELIEF

Residents respectfully pray for the following relief:

1.    An order certifying the Proposed Class herein under Federal Rule 23 and appointing Plaintiff and his undersigned counsel of record to represent the same;

2.    Award damages in the amount of $50,000.00 to each member of the Plaintiff Class;

3.    Grant an award of attorneys' fees and expenses;

4.    Grant other such equitable and other relief as the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully Submitted,


_____/s/_____
Connor Bleakley (VSB No. 92113)
Seth R. Carroll (VSB No. 74745)
Commonwealth Law Group, LLC
3311 West Broad Street
Richmond, VA 23230
Phone: (804) 999-9999ext2
Facsimile: (866) 238-6415
scarroll@hurtinva.com
cbleakley@hurtinva.com