IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CAMERON FOBBS,
　　Plaintiff,

　　　　v.　　　　　　　　　　　　　　　　　Civil No. 3:21cv26 (DJN)

ROMEL HUNT, *et al.*,
　　Defendants.

## MEMORANDUM OPINION

Plaintiff Cameron Fobbs ("Plaintiff") brings this purported class action pursuant to 42 U.S.C. § 1983 against Defendants Major Romel Hunt ("Hunt") and Sergeant Branch ("Branch") (collectively, "Identified Defendants" or "Defendants"), as well as yet-unknown John Doe(s) Correctional Officers. Plaintiff alleges violations of the First, Eighth and Fourteenth Amendments. This matter now comes before the Court on the Motion to Dismiss (ECF No. 10) filed by the Identified Defendants.

For the following reasons the Court hereby GRANTS IN PART AND DENIES IN PART the Identified Defendants' Motion to Dismiss (ECF No. 10). Specifically, the Court DENIES Defendants' Motion as to Count Two, but GRANTS Defendants' Motion as to Count One based on Plaintiff's concession that he has failed to state a claim. Therefore, the Court DISMISSES WITHOUT PREJUDICE Count One of the Complaint.

## I.　　BACKGROUND

At this stage, the Court must accept as true the facts set forth in the Complaint (ECF No. 1). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant Motion.

A.    **Factual Background**

Beginning in early 2020, the United States saw a widespread outbreak of the novel coronavirus, COVID-19, which spread more quickly in settings where individuals lived in close proximity to each other, including jails and prisons. (Compl. ¶¶ 19-20, 22-23.) One of these facilities at a higher risk of suffering a severe outbreak of COVID-19 among its residents included the Richmond City Justice Center ("RCJC"), a jail located in Richmond, Virginia. (Compl. ¶¶ 7, 21.) Plaintiff was a detainee at RCJC at all times relevant to this action and a resident of Pod 5G. (Compl. ¶ 8.) Pod 5G housed both pre-trial detainees as well as convicted inmates. (Compl. ¶ 9.) Defendant Hunt worked as a major with the Richmond City Sheriff's Department, and Defendant Branch worked as a sergeant with the Richmond City Sheriff's Department. (Compl. ¶¶ 10-11.)  Both Hunt and Branch were responsible for managing and overseeing correctional staff at RCJC. (Compl. ¶¶ 10-11.)

Despite the known risks posed by COVID-19 to RCJC's residents, the Identified Defendants and all other employees of the Richmond City Sheriff's Office acted with deliberate indifference to these risks during the early months of the COVID-19 outbreak. (Compl. ¶¶ 22-25.) Specifically, the jail staff did not isolate or quarantine individuals who came into contact with suspected positive cases of the virus, allowed residents who displayed and complained of symptoms to remain among the general population, refused to enforce a mask-wearing policy among either the residents or the staff and declined to follow certain sanitation procedures, including disinfecting surfaces between uses. (Compl. ¶ 26.) This indifference and mismanagement resulted in several "large scale outbreaks" of COVID-19 at the jail, the largest of which occurred in August of 2020 when over 100 inmates tested positive for COVID-19. (Compl. ¶¶ 25, 27.)

2

In response to this outbreak, Richmond Sheriff Antoinette Irving ordered RCJC staff to separate RCJC residents into a "quarantine pod" of those who had tested positive and a "negative pod" of those who had tested negative. (Compl. ¶¶ 29-30.)  However, RCJC staff made minimal effort to identify and isolate close contacts of residents who had tested positive and been placed in the quarantine pod, despite the staff's knowledge that individuals without a positive test result could still spread the virus. (Compl. ¶¶ 31-32.)  Defendants did not allow residents to self-quarantine or re-test even after they developed symptoms following the initial round of testing. (Compl. ¶ 33.)  RCJC also continued to transfer new residents onto Pod 5G from other pods, including previously quarantined individuals who had been allowed to terminate their quarantine early. (Compl. ¶ 34.)

Residents of Pod 5G grew increasingly concerned about RCJC's handling of this issue, so they informed the Identified Defendants and Defendants Doe(s) of their concerns. (Compl. ¶¶ 37-39.)  However, despite numerous complaints by multiple residents, neither the Identified Defendants nor the John Doe Correctional Officers took any action. (Compl. ¶ 39.)  A group of Pod 5G residents attempted to "escalate their concerns upward through the jail chain of command," speaking first to Defendant Branch, who managed the floor, and then to Branch's superior. (Compl. ¶ 41.)  However, no one responded to the residents' concerns or provided any details regarding the jail's management of the COVID-19 outbreak. (Compl. ¶ 41.)

On the evening of August 29, 2020, all jail officers left Pod 5G and announced via the intercom system that the jail was entering a lockdown. (Compl. ¶ 42.)  The lockdown required all residents to enter their cells so that their cells could be locked. (Compl. ¶ 42.)  According to Plaintiff, "the majority of residents on Pod 5G complied with the lockdown order and returned to their cells as requested." (Compl. ¶ 43.)  However, "a minority" — apparently six residents —

3

remained outside of their cells in the Pod's public area, where they continued to communicate with the Identified Defendants and other John Doe Correctional Officers via the intercom system. (Compl. ¶¶ 43, 56.) Specifically, they "expressed that they were not satisfied with the lack of answers regarding COVID-19 and were remaining outside of their cells in order to attempt to achieve better communication with Defendants." (Compl. ¶ 43.)

Fifteen to thirty minutes passed after RCJC staff announced the lockdown order with no further action taken or orders given by the Identified Defendants or the other correctional officers. (Compl. ¶ 45.) "Eventually, correctional officers locked the cell doors so that those inside their cells could not leave and those outside of their cells could not enter their cells, even if they decided that they would comply with the lockdown order." (Compl. ¶ 46.) Correctional officers again used the intercom system to tell the residents to go into lockdown. (Compl. ¶ 47.) Because the initially noncompliant inmates could no longer enter their locked cells, Defendant Doe(s) ordered them to stand next to their cells instead. (Compl. ¶ 47.) The remaining residents complied with this order and went to stand next to their cells. (Compl. ¶ 48.)

At this point, no resident had threatened violence, put another inmate or officer in physical danger or otherwise refused to comply with the officers' follow-up orders. (Compl. ¶ 49.) However, "[d]uring the time that had passed since some Residents had initially refused to go into their cells, Defendants Branch, Hunt, and Doe(s) planned and prepared an assault on Pod 5G in retaliation for the noncompliance of some of the Residents." (Compl. ¶ 50.) Despite the compliant, "calm environment within the Pod," the Identified Defendants and John Doe Correctional Officers began rolling cannisters of tear gas into the Pod through the tray slots in the Pod's entrance doors, causing the entire Pod to fill with tear gas. (Compl. ¶¶ 52, 54-55.) The residents trapped inside their cells "immediately struggled to breathe." (Compl. ¶ 58.) They

4

attempted to breathe by placing their mouths over their cells' air vents, but they quickly discovered that Defendants had turned off the ventilation system for the Pod so that no fresh air could flow through the vents and alleviate their pain. (Compl. ¶ 59.) The residents also attempted to soothe their burning skin by using water from the sinks in their cells, but the sinks had no water pressure. (Compl. ¶ 60.) "Without any ventilation, the gas was unable to disperse and settled into the cells. The residents were unable to escape, clean themselves of the poison, or get any fresh air." (Compl. ¶ 61.)

The remaining six residents who had been standing outside of their cells rushed into the single open cell in an attempt to escape the gas. (Compl. ¶ 56.) Yet, as they entered, an officer walked up to the cell, sprayed them with pepper spray and locked them inside the cell. (Compl. ¶¶ 56-57.)

"After some time," officers began to remove the residents from the Pod one by one, a process that took thirty minutes. (Compl. ¶¶ 70-71.) The residents then stood out in RCJC's recreation yard for approximately an hour, vomiting, coughing severely and struggling to catch their breath. (Compl. ¶ 71.) The majority of the residents did not receive medical care, even those who suffered from pre-existing respiratory conditions. (Compl. ¶ 71.) After the residents returned to their cells, RCJC staff placed them on immediate lockdown, and many, including Plaintiff, had to wait four days to take a shower to remove the chemical irritants from their skin. (Compl. ¶ 72.) During the intervening days, the chemical irritants continued to burn the residents' skin and cause Plaintiff and many others to suffer extreme discomfort and psychological distress. (Compl. ¶ 72.)

According to Plaintiff, this tear gas assault did not constitute the normal protocol for responding to inmates who resisted going into lockdown — normally, RCJC staff would simply

detain the recalcitrant inmate, remove them to segregation and use pepper spray only if the inmate became physically resistant. (Compl. ¶ 44.) Additionally, RCJC maintains a Use of Force policy that governs the use of weapons such as tear gas, because this chemical has such dangerous effects including the possibility of death if subjected to long-lasting exposure in a closed setting. (Compl. ¶ 66.) This policy limits the use of Riot CS Smoke — the gas used here — "to situations where an imminent risk of physical harm is present, and specifically states that these agents will not be used 'indiscriminately to control or disperse a crowd.'" (Compl. ¶ 66.)

### B.     Plaintiff's Complaint

On January 14, 2021, Plaintiff filed a Complaint against Defendants, raising two counts for relief based on the above allegations and intending to seek certification on behalf of all residents of Pod 5G as of August 29, 2020, the date of the aforementioned incident. (Compl. ¶ 9.) Count One raises a § 1983 claim based on Plaintiff's allegation that Defendants used force in direct retaliation against the residents of Pod 5G for exercising their First Amendment right to stand up for their request for medical treatment and information about COVID-19. (Compl. ¶¶ 85-93.) Count Two also raises a § 1983 claim based on Plaintiff's allegation that Defendants violated Plaintiff's Eighth and Fourteenth Amendment rights by using excessive force to inflict pain unnecessarily and wantonly without penological justification. (Compl. ¶¶ 94-104.)

However, in his Response to the Identified Defendants' Motion to Dismiss, Plaintiff concedes that the Complaint fails to allege that he suffered a violation of his First Amendment rights and, therefore, he would not qualify as an adequate class representative for those inmates who had suffered such a violation. (Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Resp.") (ECF No. 14) at 5.) For those reasons, Plaintiff requests that the Court dismiss Count

One of his Complaint without prejudice, a request that the Court hereby GRANTS. This leaves only Count Two, the excessive force claim, remaining.

### C.    Defendants' Motion to Dismiss

In response to Plaintiff's Complaint, on February 26, 2021, the Identified Defendants filed a Motion to Dismiss (ECF No. 14), moving to dismiss Plaintiff's claims against them for failure to state a claim under Rule 12(b)(6) and failure to satisfy the requirements for class certification under Rule 23(d)(1)(D). In support of their Motion, the Identified Defendants contend that the use of tear gas in the circumstances alleged did not constitute excessive force in violation of the Eighth Amendment, and that regardless, Defendants Hunt and Branch can claim the protections of qualified immunity. (Mem. in Supp. of Mot. to Dismiss of Defs. ("Defs.' Mem.") at 10-18.) They also argue that Plaintiff has failed to specify personal actions taken by Hunt and Branch that establish that they committed constitutional violations and that Plaintiff has not met the requisite pleading standard due to this lack of specificity. (Defs.' Mem. at 18-21.)

The Identified Defendants additionally challenge whether Plaintiff's Complaint meets the requirements for class certification pursuant to Federal Rule of Civil Procedure 23. (Defs.' Mem. at 21.) Specifically, they contend that Plaintiff's claims do not meet either the requirements of Rule 23(b)(2) or 23(b)(1), and that they cannot meet the general requirements of 23(a), including the requirements of commonality and adequacy of representation. (Defs.' Mem. at 22-26.)

The Identified Defendants' remaining arguments focus on Plaintiff's First Amendment claim, including their argument that Plaintiff's claim fails because the residents did not exhaust their administrative or legal remedies as required by the Prison Litigation Reform Act ("PRLA")

7

before protesting the COVID-19 conditions at the jail. Therefore, the Court will not review these arguments in detail given Plaintiff's concession that he has failed to make out a First Amendment claim. However, the Identified Defendants vaguely suggest in their Reply that their PRLA argument also defeats Count Two, because Plaintiff admits that "multiple inmates have actually filed grievances" regarding the tear gas incident, indicating that "reasonable inmate[s] of ordinary firmness and fortitude" were not deterred by Defendants' actions from using the administrative process to address their claims. (Reply Mem. in Supp. of Mot. to Dismiss) ("Defs.' Reply") (ECF No. 15) at 1.). Although the Identified Defendants do not explain this argument in detail, the Court will nevertheless consider it.

Plaintiff filed his Response in Opposition to the Identified Defendants' Motion on March 12, 2021, and the Identified Defendants filed their Reply on March 18, 2021, rendering Defendants' Motion now ripe for review.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which

8

it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

### III.   ANALYSIS

#### A.   Exhaustion of Administrative and Legal Remedies

As a threshold matter, Defendants argue that the PLRA's exhaustion requirement bars Plaintiff's suit. Pursuant to the PLRA, inmates must generally exhaust their administrative remedies before pursuing a § 1983 claim in federal court. 42 U.S.C. § 1997e(a). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). This includes when the administrative process "operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates," becomes "so opaque that it [is], practically speaking, incapable of use" or "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 S.Ct. 1850, 1859-60 (2016).

9

To determine whether a prison administrator or officer has rendered an administrative remedy unavailable through intimidation or threats, the Eleventh Circuit has established a two-part test that other circuits have adopted. A plaintiff must show both subjectively that "(1) the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process;" and, objectively that "(2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance . . . ." *Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008); *see also Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (adopting *Turner* test); *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015) (adopting *Turner* test); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011) (adopting *Turner* test). District courts in the Fourth Circuit have also adopted the *Turner* test. *See Firewalker-Fields v. Whyche*, 2021 WL 1082484, at \*5 (E.D. Va. Mar. 17, 2021) (applying *Turner* test); *Rodrigues v. Hamilton*, 2021 WL 413530, at \*4 (W.D. Va. Feb. 5, 2021) (same).

As to the subjective component of this test, Plaintiff states that "[a]s a result of Defendants' brutal and malicious retaliation against Residents on Pod 5G, residents are reasonably terrified of pursuing any of the administrative remedies which may be otherwise available at the RCJC in order to seek redress of their grievances." (Compl. ¶ 82.) Plaintiff notes that at least one putative class member attempted to file a grievance, but "was subjected to retaliation and was placed in the segregation unit without a charge for several days." (Compl. ¶ 82.) Based on this claim of his subjective fear, Plaintiff has adequately alleged that Defendants' actions deterred him from lodging a grievance regarding Defendants' actions or otherwise pursuing another part of the administrative process before filing this suit.

Additionally, construing the allegations in a light most favorable to Plaintiff at this stage, Plaintiff has also met the objective component of the *Turner* test. Plaintiff's claims derive from

10

the residents of Pod 5G's attempts to lodge grievances with the RCJC administration regarding their treatment in the jail and the jail's COVID-19 health and safety protocols. Apparently as a direct result of this attempt to lodge grievances, Defendants "retaliated against these . . . entirely reasonable demands" and initiated the "shocking and unconstitutional brutality" described in the Complaint. (Compl. ¶ 80.) It proves reasonable to assume that after this attack, these residents would not feel that they could lodge an additional grievance with the same supervisors who played an integral role in the attack. As stated by Plaintiff, it "is inarguable that Defendants' decision to employ tear gas and chemical irritants, during a deadly pandemic, in response to the Residents' demands that their concerns be addressed is conduct that would 'deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing a particular part of the process.'" (Compl. ¶ 84.) For these reasons, the Court finds that Defendants have rendered "unavailable" any administrative remedies that Plaintiff might otherwise attempt to seek.

While Defendants' arguments regarding PLRA exhaustion largely center on the First Amendment claims that Plaintiff has agreed to voluntarily dismiss (thereby rendering "any argument addressing the PLRA on those grounds [as] moot"), Defendants briefly note in their Reply that other inmates filed grievances regarding the tear gas incident, thereby belying Plaintiff's assertion that a reasonable inmate would feel deterred from filing a grievance. (Defs.' Reply at 1.) However, this argument finds little purchase, given Plaintiff's contention that these inmates had to "overcome significant intimidation to file" these complaints, that they subsequently "have seen no response or explanation" and that, as stated, at least one inmate has suffered retaliation by RCJC staff as a result. (Compl. ¶¶ 82-84.) Together, these allegations confirm that a "reasonable inmate of ordinary firmness and fortitude" would now feel

11

discouraged from pursuing administrative remedies by the threatened actions and inactions of RCJC staff members.

## B.    Excessiveness of the Use of Tear Gas

The Court now turns to the substantive viability of Plaintiff's allegations. Defendants contend that their use of tear gas did not qualify as excessive under either the applicable test for pre-trial detainees under the Fourteenth Amendment or the similar test for convicted inmates under the Eighth Amendment. (Defs.' Mem. at 10.) Plaintiff disagrees, arguing that the balance of factors supplied by these tests weighs in Plaintiff's favor. (Pl.'s Resp. at 8.) Plaintiff also contends that every resident of Pod 5G has a viable clam under the facts as alleged, regardless of their status as an inmate, detainee, resister or innocent bystander. (Pl.'s Resp. at 12-13.)

The Eighth Amendment generally prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. For inmates in the prison context, it protects against "inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotations omitted). This inquiry normally involves both a subjective and an objective component. *Id.* The objective component merely requires that the injury suffered "was sufficiently serious," a standard easily met "as long as [the injury] rises above the level of de minimus harm." *Id.* The subjective component requires a prisoner to "demonstrate that officials applied force 'maliciously and sadistically for the very purpose of causing harm.'" *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). The factors that the Supreme Court has directed the Court to consider in making this determination include: "(1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible

12

officials, and (4) any efforts made to temper the severity of a forceful response." *Id.* at 762 (internal quotations omitted) (citing *Whitley*, 475 U.S. at 321).

Excessive force claims brought by pretrial detainees fall under the ambit of the Fourteenth Amendment's Due Process clause, because a state official does not technically have the authority to "punish" an un-convicted detainee. *Coney v. Davis*, 809 F. App'x 158, 159 (4th Cir. 2020) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015)). Thus, in determining whether the use of force against a pretrial detainee was "excessive" under *Kingsley*, the Court need only consider whether the force "was objectively unreasonable." 576 U.S. at 397. This inquiry turns on the facts and circumstances of the individual case with a consideration of the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.*

Several factors prove particularly pertinent to this inquiry, including: (1) the relationship between the need for the force and the amount of forced used; (2) the extent of the plaintiff's resulting injury; (3) efforts made by the acting officer to "temper or limit" the amount of force used; (4) the severity of the security problem at hand; (5) the threat posed as reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* While not an exhaustive list, these factors constitute an appropriate starting point for the kinds of considerations that the Court must make in its excessive force determination. *Id.* Thus, many of the factors that the Court must consider when analyzing the subjective component of the Eighth Amendment test also constitute factors in the Fourteenth Amendment objective unreasonableness test, and so, courts have "traditionally looked to Eighth Amendment precedents" as guidance when considering Fourteenth Amendment claims. *Mays v. Sprinkle*, __F.3d __, 2021 WL 1181273, at *2 (4th Cir. Mar. 30, 2021).

In general, courts must afford prison officials significant deference in "the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline," and must assume an "appropriate hesitancy" before critiquing "in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley*, 475 U.S. at 320-22 (internal quotations omitted). Certainly, prison officials assume the difficult task of taking "into account the very real threats [that] unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used" when making and enforcing decisions to use force to restore order during a disturbance. *Id.* at 320. They should therefore be assured that their swift and decisive actions in contentious and rapidly evolving situations will not automatically expose them to civil liability.

In accordance with this principle, the Fourth Circuit has affirmed that mace and tear "can be constitutionally used [in prisons] in small quantities to 'prevent riots and escapes' or to control a 'recalcitrant inmate.'" *Williams*, 77 F.3d at 763 (quoting *Landman v. Peyton*, 370 F.2d 135, 138 n.2 (4th Cir. 1966)). Indeed, in some circumstances, the use of mace or tear gas might prove a more humane and effective form of force than actual physical force. *Id.*

However, the Fourth Circuit has also tempered this general principle, and cautioned courts to "closely scrutinize[]" the use of these products, given that "such weapons 'possess inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim.'" *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). As such, the gas employed must match the "gravity of the occasion" under the totality of the circumstances and considering all relevant factors. *Bailey v. Turner*, 736 F.2d 963, 969 (4th Cir. 1984). And so, courts have found violations of the Eighth Amendment where an officer used more than a

14

"reasonable" amount of a chemical agent. *See, e.g.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding plausible violation of Eighth Amendment when officers discharged two entire cans of pepper spray into plaintiff's face); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (finding violation where correctional officers soaked prisoner's entire cell with pepper spray using a large cannister that resembled a fire-extinguisher); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (finding violation where officer sprayed pepper spray "indiscriminately" along plaintiff's prison tier absent any need to maintain or restore order on the tier). Yet, courts have also found multiple applications of pepper spray reasonable where inmates repeatedly ignored commands. *See, e.g.*, *Williams*, 77 F.3d at 763 (finding no violation where officer maced inmate who threw "foul-smelling liquids" at him out of cell's service window and then refused to remove his arm from the window after the officer commanded him to); *Jackson v. Morgan*, 19 F. App'x 97, 102 (4th Cir. 2001) (finding no violation where officer used twelve bursts of pepper spray at three separate times after inmate repeatedly refused to comply with commands to move from his cell); *Norris v. Detrick*, 918 F. Supp. 977, 984 (N.D. W. Va. 1996) (upholding use of pepper spray when inmate refused commands to return to his cell during lockdown three separate times over the course of an hour).

Accordingly, "it is necessary to examine the totality of the circumstances . . . to determine the validity of the use of tear gas in the prison environment." *Williams*, 77 F.3d at 763 (internal citations and alterations omitted). Applying the aforementioned factors here and construing the facts in a light most favorable to Plaintiff as the Court must do at this stage, the Court finds that Plaintiff has established a plausible violation of his constitutional rights, as well as of the rights of the other residents of Pod 5G on the night at issue here.

15

### 1.    *Need for Application of Force Used, Severity of Problem and Threat Posed*

Taking the facts as alleged as true, these related factors weigh in Plaintiff's favor.  While not *per se* unconstitutional, "the use of gas to disable a man physically who poses no present physical threat constitutes a form of corporal punishment, the use of which in such a situation is generally disapproved.  Undoubtedly it is effective, but it is painful, and its abuse is difficult to forestall." *Landman v. Royster*, 333 F. Supp. 621, 649 (E.D. Va. 1971).  Accordingly, the use of a chemical agent on a docile, subdued or compliant inmate has been found unconstitutional.  *See Iko*, 535 F.3d at 239 (upholding finding of excessive force after officers deployed pepper spray on an initially recalcitrant inmate who had become "docile" and "passive"); *see also Tedder v. Johnson*, 527 F. App'x 269, 274 (4th Cir. 2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force).  Certainly, "when officers do use force — including pepper spray — against a formerly recalcitrant inmate *after* he has been subdued, then a reasonable jury may infer that the force was applied not for protective reasons but instead to retaliate or punish." *Dean v. Jones*, 984 F.3d 295, 304 (4th Cir. 2021) (emphasis in original).

According to Plaintiff's version of events, the majority of Pod 5G residents — including Plaintiff — complied with the first order to enter lockdown and willingly entered their cells, which the officers promptly locked.  (Compl. ¶ 43.)  Only a few individuals remained outside of their cells, and they only did so to communicate with prison officials regarding the conditions of their confinement.  Nearly half an hour later, the officers gave a second order to enter lockdown to the few inmates who had not entered their cells.  (Compl. ¶ 45.)  Plaintiff gives no indication that these individuals had escalated the situation on Pod 5G during that half hour, threatened violence to the security officers or otherwise attempted to aggravate the situation.  In fact, the remaining residents who had not initially complied with the officers' first order, attempted to

*deescalate* the situation by complying with the second order and returning to their cells. (Compl. ¶¶ 47-48.) However, they could not fully comply, because the officers had already locked their cells. (Compl. ¶ 47.) So, instead, they complied with the officers' orders to simply stand next to their cells. (Compl. ¶¶ 47-48.)

While some use of force may have been warranted against the initially recalcitrant inmates if they had continued to refuse to comply with the lockdown order, no reason existed to exert force against the residents who had immediately obeyed Defendants' commands and entered their cells. The severity of the problem and the need for force appeared low given that the locked cells rendered the majority of the inmates incapable of threatening physical harm against the Identified Defendants or other staff members.

Moreover, because the initially recalcitrant inmates deescalated the situation that they had created by complying with the second command to lockdown, little apparent reason existed to use force against them even though they remained outside of their cells. The Complaint contains no suggestion that the atmosphere on the cellblock became disordered, unruly or violent during the half-hour between the initial order and the second lockdown order. All disruptive behavior had stopped. In fact, Plaintiff describes the environment in Pod 5G as "calm" and the attitude of the residents as "compliant." (Compl. ¶¶ 49, 52.) Additionally, all of the RCJC staff members were outside of the Pod by that time, so they cannot claim to have been in any immediate physical danger.

Importantly, RCJC's Use of Force policy also offers a guide to correctional staff for when the use of gas is appropriate or "necessary." As stated, this policy limits the use of Riot CS Smoke "to situations where an imminent risk of physical harm is present, and states that these agents will not be used 'indiscriminately to control or disperse a crowd.'" (Compl. ¶ 66.) The

Court fails to see how the situation as described by Plaintiff met this definition and, therefore, warranted the indiscriminate use of force described in the Complaint.

In sum, the Court concludes that Plaintiff has alleged sufficient facts that the Identified Defendants' use of force constituted an unnecessary and excessive response to the threat posed by the situation in Pod 5G. *See Peoples v. South Carolina Dep't of Corrections*, 2008 WL 4442583, at *9 (D.S.C. Sept. 25, 2008) (finding application of force unnecessary when all disorderly behavior had allegedly ceased before officers entered cellblock and deployed gas).

### 2.    *Extent of Plaintiff's Injury*

The second factor also weighs in Plaintiff's favor.  As stated, "a limited application of mace may be 'much more humane and effective than a flesh to flesh confrontation with an inmate,'" especially given that "prompt washing of the maced area of the body will usually provide immediate relief from pain."   *Williams*, 77 F.3d at 763 (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)).  Indeed, the "limited application" of this substance generally constitutes a relatively "mild" intrusion on an individual's physical and mental wellbeing, as compared to other forms of force that have more permanent or lasting physical impacts on an individual.  *Id.*

However, courts have concluded that an inmates' rights can be violated when officers withhold proper medical attention or basic hygienic remedies such as a shower or change of clothes after deploying the chemical irritant, thereby allowing the painful effects to linger.  *See Walker v. Bowersox*, 526 F.3d 1186, 1189 (8th Cir. 2008) (finding triable jury issues where defendant was sprayed with pepper spray in cell and then was prevented from showering, having clean clothes or changing his bedding for three days); *Foulk v. Charrier*, 262 F.3d 687, 701 (8th Cir. 2001) (affirming Eighth Amendment violation where, after officer sprayed pepper spray in

inmates face, inmate "received no medical care and had no ability to wash off the pepper spray, [and] continued to feel its painful effects for several days").

Several facts persuade the Court that, on balance, this factor weighs in favor of a finding of excessive force.  For one, the Identified Defendants allegedly shut off the ventilation to the inmates' cells, thereby enhancing the suffocating effects of the gas, a decision that served no other purpose than to heighten the pain and suffering of the residents.  They then denied Plaintiff and his fellow inmates the opportunity to wash the affected areas of their bodies for many days following the incident, causing the residents to suffer further psychological and physical pain.  Finally, the Identified Defendants refused to allow many of the residents to receive consultation from a medical professional, thereby preventing the inmates from ameliorating or treating the effects of the gas.

Thus, on balance, the efforts by Defendants to enhance the physical effects of the gas during the initial attack, the lack of immediate relief provided through basic hygienic methods and the ongoing physical and psychological pain inflicted on Plaintiff and the other residents of Pod 5G in the days following the incident tilt this factor in support of Plaintiff's excessive force claims.

### 3.        *Efforts to Limit Force*

According to Plaintiff's version of events, the Identified Defendants did little to limit their use of force before resorting to it.  A "minority" of the Pod 5G residents declined to enter their cells after Defendants commanded them to lockdown.  No other actions were taken or commands given by the Identified Defendants between this initial show of resistance and the correctional officers' second command to the residents to enter their cells.  (Compl. ¶ 47.) Apparently without any other show of resistance, these inmates obeyed the officers' second

19

command and complied with their order to stand outside of their cells instead.  (Compl. ¶ 47.)

During this entire time, Plaintiff and the "majority" of the other residents of 5G were inside their

cells, completely compliant with the correctional officers' original orders.

Despite this lack of resistance, threat to officer safety or otherwise disobedient behavior

— indeed, the inmates appeared to be deescalating the situation and demonstrating their

willingness to comply with Defendants' commands — Defendants initiated their tear gas attack.

Based on these facts, a reasonable trier of fact could conclude that Defendants did not make a

sufficient effort to limit their use of force, especially because the residents of Pod 5G appeared to

be obeying their commands at the time that Defendants decided to launch their tear gas "attack."

### 4.    *Active Resistance*

As stated, Plaintiff alleges that he and the majority of his fellow detainees were locked in

their cells during this entire incident.  In fact, Plaintiff entered the cell upon Defendants' first

command and stayed there.  He and most of the other residents on Pod 5G never exhibited any

form of resistance that would have warranted the use of force.  Moreover, while Plaintiff

acknowledges that some individuals initially resisted the officials' commands, this resistance

ceased before any force was used.  Little reason existed for the Identified Defendants to escalate

to the use of force.  Thus, this final factor also tips in Plaintiff's favor, given that none of the

residents of Pod 5G exhibited active resistance to Defendants or their commands at the time that

Defendants decided to act with the force that they did.

For these reasons, the Court finds that Plaintiff has made out an excessive force claim.

Additionally, the other residents of Pod 5G also have viable claims as well, regardless of their

status as an inmate, detainee or one of the initial resisters.  Of course the facts contained in the

Complaint represent but one side of the story, and further information uncovered during

20

discovery may cause the Court to reweigh these factors in Defendants' favor. However, Plaintiff's claims that Defendants subjected a compliant group of inmates to an indiscriminate use of tear gas over a prolonged period of time absent a clear need is sufficient to meet his burden at this stage.

### C.    Qualified Immunity

Defendants also claim that regardless of whether the Court finds a viable constitutional violation, they are entitled to qualified immunity because they did not violate a *clearly* established right. (Defs.' Mem. at 16.) The doctrine of qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Wingate v. Fulford*, __ F.3d __, 2021 WL 377796, at *8 (4th Cir. Feb. 4, 2021). Thus, the doctrine of "[q]ualified immunity 'balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In doing so, it "'gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Barrett v. PAE Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020) (quoting *Stanton v. Sims*, 571 U.S. 3, 5 (2013)). "Further, qualified immunity is 'immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Gilliam v. Sealey*, 932 F.3d 216, 229 (4th Cir. 2019). "The burden of establishing a qualified immunity defense rests on the official asserting the defense." *Wingate*, 2021 WL 377796, at *8.

The Supreme Court has determined that a court must apply the doctrine of qualified immunity "unless (1) [the government actor] violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  At the first step, the court must determine whether, when viewing the facts and drawing all reasonable inferences in the light most favorable to the plaintiff, the defendant violated the constitutional rights of the plaintiff.  *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019).  While the Supreme Court previously required courts to follow these steps in sequential order, it has since held that "while the sequence set forth [ ] is often appropriate, it should no longer be regarded as mandatory."  *Pearson*, 555 U.S. at 236 (discussing *Saucier v. Katz*, 533 U.S. 194 (2001)).  Now, "judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  *Id.*

The Fourth Circuit has provided the following guidance when assessing whether a right was clearly established:

> [A court must] first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose.  In the absence of directly on-point, binding authority, courts may also consider whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority.  The Supreme Court has ruled against defining a right at too high a level of generality and held that doing so fails to provide fair warning to officers that their conduct is unlawful outside an obvious case.

*Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020) (internal quotations and citations omitted).  Thus, a showing of "clearly established" requires that "the right allegedly violated must be established not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official."  *Reichle*, 566 U.S. at 665 (internal quotations and

citations omitted).  However, a "general constitutional rule may apply with obvious clarity even though the very action in question has not previously been held unlawful." *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) (internal quotations omitted). Thus, the appropriate inquiry is "whether the law is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Halcomb v. Ravenell*, ___ F.3d___, 2021 WL 1182911, at *2 (4th Cir. Mar. 30, 2021) (internal quotations omitted).

This standard balances the plaintiff's interest in vindicating his constitutional rights with the interest of the government official in "'reasonably . . . anticipat[ing] when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

Because the Court has already established a plausible constitutional violation, the question that remains is whether the right violated by Defendants was clearly established. As stated, because Plaintiff constitutes a pretrial detainee, the Fourteenth Amendment governs his claims. *Mays*, ___F.3d ___, 2021 WL 1181273, at *2. However, courts have "traditionally looked to Eighth Amendment precedents" as guidance when considering Fourteenth Amendment claims. *Id.*

The Fourth Circuit has stated that "[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Williams*, 77 F.3d at 763. And, the Fourth Circuit has since reaffirmed this principle, noting that *Williams* gives

23

"fair warning" that the excessive use of chemical agents in a prison setting constitutes an unconstitutional act. *Iko*, 535 F.3d at 240.

The situation presented in *Iko* proves pertinent to the qualified immunity question here. There, prison officials instructed the defendant to insert his wrists through a cell door so that they could handcuff him and move him from an isolation cell. 535 F.3d at 230-31. The defendant refused. *Id.* at 231. Officers then received authorization to use force to remove the defendant from his cell. *Id.* When the defendant still did not move after a subsequent command, an officer deployed pepper spray through the door. *Id.* When the defendant still did not respond, the officer deployed more pepper spray. *Id.* As the officer deployed this spray, the defendant approached the door with his wrists and hands face down and inserted them through the slot in the cell door to be handcuffed. *Id.* However, other officers began yelling at the defendant, ordering him to turn around instead and place his hands behind his back through the slot. *Id.* at 232. When the defendant did not respond to this command, the officer administered another burst of pepper spray to which the defendant responded by laying down on the floor of his cell. *Id.* The officers administered one final burst of pepper spray before entering. *Id.* The court noted that it "[was] undisputed that at no point during the spraying did Iko respond violently or in a confrontational manner." *Id.* And, the defendant was not given the opportunity to change out of his pepper-spray-soaked clothes. *Id.* The court therefore found the officers' use of pepper spray excessive. *Id.* at 240.

The case stands for the principle that "using pepper spray on a docile or compliant prisoner or depriving a prisoner of a proper opportunity to fully decontaminate, including forcing them to remain in their contaminated clothes, demonstrates maliciousness and qualifies as excessive force." *Murray v. Lilly*, 426 F. Supp. 3d 245, 253 (S.D. W. Va. 2019) (citing *Iko*, 535

24

F.3d at 232); *see also Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. 2014) ("Our precedent establishes that the use of pepper spray on a docile prisoner could qualify as excessive force.") (citing the same). Thus, *Iko* and the well-recognized principle that "it is a violation of the Eighth Amendment for prison officials to use . . . tear gas . . . in quantities greater than necessary or for the sole purpose of infliction of pain" put Defendants on clear notice that their acts, as described in the Complaint, violated Plaintiff's clearly established constitutional rights.  As in *Iko*, Defendants deployed a chemical irritant on a group of compliant, non-violent inmates and pre-trial detainees, and, although some level of initial force may have been warranted upon the inmates first refusal to follow orders, the officers were obligated to scale back their approach upon the subsequent compliance by the residents.  Indeed, the facts plausibly allege that the Identified Defendants did not act to restore order or quell insurrection, but rather for the sole purpose of inflicting pain or causing harm in violation of Plaintiff's clearly established constitutional rights.  Therefore, the Court concludes that Defendants cannot claim the protections of qualified immunity at this stage.

### D.    Sufficiency of Allegations as to Personal Actions Taken by Hunt and Branch

The Identified Defendants also argue that the Complaint fails to outline the personal actions of Defendants Hunt and Branch except in the most conclusory terms, and that this lack of specificity proves insufficient to state constitutional claims against them. (Defs.' Mem. at 18-21.)  They take particular issue with the fact that many of the allegations in the Complaint "group" Defendants together, "without detailing each Defendant's actions or roles." (Defs.' Mem. at 19.)

To establish a claim under § 1983, a plaintiff must allege that the defendant "(1) deprived a plaintiff of a right secured by the Constitution and laws of the United States, and (2) that the

deprivation was performed under color of" state law. *Phillips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Defendants correctly state that to establish a § 1983 claim, a plaintiff "must plead and prove that each Government-official defendant, through the official's own actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Plaintiff has met this standard. Plaintiff specifically alleges that Defendants Hunt and Doe were both "responsible for managing and overseeing other correctional staff at RCJC." (Compl. ¶¶ 10-11.) Plaintiff also names Hunt and Branch as the two individuals that residents of Pod 5G approached regarding RCJC's infection control procedures, leading to the inference that they had supervisory authority and control over the conditions of the Pod and the treatment of the residents. (Compl. ¶ 38.) Furthermore, Plaintiff specifically alleges that Defendants Hunt and Doe "planned and prepared an assault on Pod 5G" when a portion of the residents did not enter their cells after the initial lockdown order. (Compl. ¶ 50.) He then clearly states that "Hunt and Branch . . . participated in the assault," which involved "rolling tear gas cannisters through the tray slots in the entrance doors" of Pod 5G in an indiscriminate manner despite no clear purpose for doing so. (Compl. ¶¶ 52, 54.) Therefore, Plaintiff alleges that both Hunt and Branch personally planned, executed and actively participated in the unconstitutional attack described in the Complaint. The Court finds these allegations sufficient to state a claim.

Furthermore, contrary to Defendants' assertions, Plaintiff's decision to refer to all Defendants as a group in certain sentences does not automatically create too attenuated of a connection between the Identified Defendants and the factual allegations in those sentences. Defendants cite to *Harvey v. Simon* for the principle that "a vague reference to a group of

26

defendants, without any specific allegation tying the individual defendants to the alleged unconstitutional conduct, fails to state a claim for relief with respect to those defendants." (Defs.' Mem. at 20 (quoting *Harvey v. Simon*, 2017 WL 1706262, at *4 (E.D. Va. Apr. 28, 2017).) There, a *pro se* plaintiff "merely included the names of [the defendants] in list format at the beginning of his" allegations and failed to "allege any facts suggesting that the [d]efendants had any direct involvement or personal responsibility in the terse summary of wrongdoings." *Id.* at *4.

However, unlike in *Harvey*, the collective reference to "Defendants" throughout Plaintiff's Complaint does not defeat the plausibility of the allegations in the ensuing statements. Plaintiff specifically alleges that each Defendant had an active and "direct involvement" in or "personal responsibility" for each wrongdoing attributed to them in the collective, including the planning of the tear gas assault despite the knowledge that it was not necessary, the act of rolling tear gas into the pod, the decision to turn off the ventilation to the cells and the choice to deprive the residents of medical attention or showers. This proves especially true for Branch and Hunt given Plaintiff's claim that they had a supervisory role in the management of the Pod. In sum, Hunt and Branch have fair notice of the grounds upon which Plaintiff's § 1983 claim rests, and the Court will not dismiss Plaintiff's claims on these grounds.

### E.    Class Certification Requirements

Finally, the Identified Defendants contend that Plaintiff cannot satisfy the requirements for class certification and, therefore, the Court should dismiss his class claims now rather than waiting until Plaintiff moves for class certification. (Defs.' Mem. at 21.) Specifically, Defendants argue that Plaintiff's claims do not satisfy any of the three categories set forth in Rule 23(b), including 23(b)(1) and (2), the two grounds for certification set forth in the

27

Complaint, and that they do not meet several of the general requirements of Rule 23(a), including commonality and adequacy of representation. (Defs.' Mem. at 25-26.)

In Plaintiff's Response, Plaintiff concedes that "because the predominate remedy sought is monetary damages, it would be more appropriate to certify the class pursuant to Rule 23(b)(3)" rather than the other sections of Rule 23(b) cited in the Complaint. (Pl.'s Resp. at 21.) However, Defendants respond that the Court should deny class certification based on Plaintiff's failure to specify this ground in his Complaint. (Defs.' Reply at 9.)

As to this last argument, the Court will not deny class certification at this stage based on Defendants' failure to identify the specific provision of Rule 23(b) upon which his class claims rely. As stated, a complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" at this stage. *Twombly*, 550 U.S. at 555. In his Complaint, Plaintiff states that his action "satisfies the requirements for certification under Rule 23(b)" and further states that he seeks the award of damages to each member of the class. (Compl. at 23, ¶ 15.) Although Plaintiff never specifically cites to Rule 23(b)(3), together these statements give Defendants fair notice that he will seek certification pursuant to 23(b)(3).

Furthermore, Defendants' arguments regarding class certification are largely premature at this stage, given that they ask the Court to decide definitively that this case can never be maintained as a class action. *See Banks v. Wet Dog, Inc.*, 2014 WL 4271153, at *4 (D. Md. Aug. 28, 2014) ("Normally courts reserve their analysis of the propriety of a proposed class until the plaintiffs move for class certification."); *Kennedy v. Va. Polytechnic Inst. & State Univ.*, 2010 WL 1212572, at *3 (W.D. Va. Mar. 25, 2010) ("This Court will not dismiss class action allegations where the Plaintiffs have not yet moved to certify a class under Rule 23."); *Thorpe v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008) ("Motions to strike class

28

allegations are disfavored because a motion for class certification is a more appropriate vehicle for the arguments [about class propriety].").

Indeed, while the Court must determine "as soon as practicable after the commencement of an action" whether a class action can be maintained, this normally requires a review of more evidence and argument than a complaint can provide. Fed. R. Civ. P. 23(c)(1); *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699, 707 (4th Cir. 1976) (stating that in determining whether a plaintiff has met their class certification burden, "the trial court may look to the pleadings but the determination usually should be predicated on more information than the complaint itself affords") (internal quotations omitted). The Fourth Circuit has confirmed that while "it is not essential to the resolution of every class certification motion that the trial court conduct a hearing, . . . it is essential that a plaintiff be afforded a full opportunity to develop a record containing all the facts pertaining to the suggested class." *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1268 (4th Cir. 1981). In fact, "it is seldom, if ever, possible to resolve class representation questions from the pleadings," and where facts developed during discovery prove inadequate in answering these questions, the Court may order an evidentiary hearing "if necessary for a meaningful inquiry into the requisites of Rule 23 . . . ." *Id.* at 1268. For these reasons, the Court will not dismiss this case on class certification grounds unless it proves impossible from the Complaint for Plaintiff to ever establish a class action from his allegations.

### 1. *Plaintiff's Claims Satisfy Rule 23(a) at This Stage*

Rule 23(a) lists four prerequisites for class certification: (1) numerosity of class members; (2) common questions of law or fact; (3) typicality of the parties' claims or defenses to the class; and, (4) adequacy of the representative parties' ability to protect the interests of the

class. Defendants raise challenges to the commonality, typicality and adequacy requirements in their initial Motion, and raise an additional challenge to the numerosity requirement in their Reply based on Plaintiff's Response. (Defs.' Mem. at 24; Defs' Reply at 12.)

### i.    Commonality and Typicality

As to commonality and typicality, Defendants contend that the injuries and resulting damages to each resident of Pod 5G are too individualized given "the unique circumstances of each inmate's exposure to tear gas and for how long, as well as the medical and psychological consequences, if any, each inmate may or may not have suffered." (Defs.' Mem. at 24.) Specifically, they argue that "[w]hile individualized proof of damages does not automatically preclude class certification where common issues exist, it does preclude class certification where the law requires individualized proof of damages, or where proof of damages is essential for liability," as they appear to claim is the case here. (Defs.' Mem. at 25.) Relatedly, they argue that claims for emotional damages constitute inappropriate claims to assert as a class action, because they represent very personal claims for which each class member would need to provide individualized proof as to the extent and nature of their psychological injuries. (Defs.' Mem. at 25.)

However, the fact that Plaintiff alleges emotional pain and suffering or other psychological injury does not necessarily defeat the viability of a class action. Certainly, the Fourth Circuit has stated that "the need for individualized proof of damages *may* defeat predominance where proof of damages is essential to liability." *Lienhart v. Dryvit Sys.*, 255 F.3d 138, 147 (4th Cir. 2001) (emphasis added) (citing *Windham v. American Brands*, 565 F.2d 59, 66 (4th Cir. 1977)). However, this principle does not necessarily mean that individualized proof of damages *must* defeat predominance or commonality when such proof proves essential to

30

liability, but rather that this *may* create more individualized issues better suited for separate suits, especially when issues of damage causation arise or where the complexity of the claims as they relate to injury and damages would render the class action "unmanageable." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977).

More importantly though, proof of damage is not essential to liability here. Indeed, "a state actor may be liable [under § 1983] if he 'subjects, or causes to be subject' an individual 'to the deprivation of any rights, privileges, or immunities secured by the constitution.'" *Randall v. Prince George's Cty*, 302 F.3d 188, 201 (4th Cir. 2002). Whether an official is liable for a constitutional violation itself represents a question separate from the question of the plaintiff's resultant damages. The crux of Plaintiff's allegations here is that Defendants subjected all residents of Pod 5G to an unconstitutional use of force, regardless of the residents' status as an inmate, pre-trial detainee, initial resister or immediate complier. Therefore, the predominate question of liability proves common to the class and does not depend on each individual putative class member's proof of damages.

Thus, in sum, the Court has little basis to conclude that the individual damages issue so predominates that it proves impossible for Plaintiff to make out a viable class action from his allegations. Moreover, even if later the Court determines that the damages for each class plaintiff require individualized proof better suited for separate proceedings, it constitutes a not-uncommon step in class actions to certify a class-wide liability phase followed by a more individualized damages phase. *McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 876 (7th Cir. 2015); *see also Hill v. W. Elec. Co.*, 672 F.2d 381, 387 (4th Cir. 1982) ("Bifurcation of Title VII class action proceedings for hearings on liability and damages is now commonplace . . . ."). Indeed, Rule 23(c)(4) contemplates that "an action may be maintained as a class action with

respect to particular issues." Of course, the Court may ultimately find that the individualized

damages phase would prove too unmanageable.  However, at this time, the Court has no basis to

believe that these residents' experiences proved so disparate, unique or individualized that

hearing their cases in a class action proceeding would not represent an effective judicial

management tool.

Defendants also maintain that common questions of liability do not exist because the

putative class contains some residents of Pod 5G who complied with Defendants' initial

lockdown instructions and some residents who resisted, as well as some residents who

constituted inmates and some who constituted mere pre-trial detainees, thereby creating varying

standards that the Court will need to apply to each claim.  (Defs.' Mem. at 25.)  However, the

crux of Plaintiff's allegations is that Defendants subjected all residents of Pod 5G to an

unconstitutional use of force, regardless of the residents' status as an inmate, pre-trial detainee,

initial resister or immediate complier.  And, as previously discussed, all residents of Pod 5G have

a viable claim based on the allegations in the Complaint.  Thus, the Court has little basis to

conclude that the residents endured such disparate or unique experiences that these differences

would change the applicable analysis for each putative plaintiff or otherwise render their claims

unmanageable as a class.  Therefore, Defendants' arguments prove better suited for the class

certification phase when the Court will have a more robust factual record, and can determine

whether Plaintiff has accurately characterized the differences in the putative plaintiffs' claims as

"slight variances in individual experiences."  (Pl.'s Resp. at 18.)

Finally, the Court notes that Plaintiff will not necessarily be bound by the

characterization of the class as set forth in the Complaint.  Although some courts have found that

a plaintiff who seeks to revise a class definition must seek to amend the complaint, "many courts

have held exactly the opposite: that it is inappropriate to constrain the parties to the class

definition propounded in the plaintiff's pleadings, particularly in light of the 'ongoing refinement

and give-and-take inherent in class action litigation, particularly in the formation of a workable

class definition.'" *Henderson v. Corelogic Nat'l Background Data, LLC*, 2016 WL 4611571, at

*4 (E.D. Va. Sept. 2, 2016) (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir.

2004) and collecting cases stating the same). Moreover, Rule 23(c)(1)(C) "explicitly

contemplates the amendment of a class certification order before final judgment." *Id.* While the

Court will not definitely determine this question now, it appears reasonable to allow Plaintiff to

"attempt[] to refine the theory that [he has] espoused since the initiation of this case so as to

make the proposed class more manageable" as this case develops. *Id.*

### ii.    Adequacy

As to the adequacy requirement, Defendants contend that Plaintiff cannot serve as an

adequate representative because, as a member of the group of compliant inmates, Plaintiff has a

conflict of interest with those inmates who failed to comply with Defendants' initial orders to

enter into lockdown, given that they caused Defendants' use of CS gas. (Defs.' Mem. at 26.)

However, as already stated, Plaintiff argues that the use of gas against *all* inmates constituted a

constitutional violation. Moreover, the Court has already concluded that Plaintiff has

adequately alleged a constitutional injury to all putative plaintiffs. Therefore, at this stage, the

Court has little reason to conclude that Plaintiff would not represent an adequate representative

of his proposed class. And, again, the Court may later allow Plaintiff to refine or amend the

proposed class if additional discovery reveals that the non-compliant inmates actions were so

egregious or threatening leading up to the use of CS gas that the Court cannot reasonably

compare their experiences with the compliant inmates.

### iii.     Numerosity

Finally, as to numerosity, Defendants argue that Plaintiff has not met the numerosity requirement, because Plaintiff has conceded that only eight inmates have indicated their desire to pursue a claim thus far.  Additionally, because Plaintiff alleges that he can create commonality by reducing or reorganizing the proposed class into subclasses based on their individualized experiences, Defendants contend that this will further affect the numerosity analysis. (Defs.' Reply at 11-12.)

Again, this represents a question better answered at the class certification stage.  At that point, Plaintiff will have a better understanding of the number of potential inmates who seek to pursue a claim against Defendants, the nature of those individual claims and whether enough of these claims prove similar enough to meet the numerosity requirement.  However, at this stage, the Court only has Plaintiff's allegations that 50-100 inmates were subjected to the same constitutional violation, at the same time and in the same manner, and further suffered common physical and psychological injuries.  This proves sufficient to meet the numerosity requirement at this time.

Therefore, the Court finds that Plaintiff's Complaint proves not so devoid of a basis for class certification as to warrant its dismissal based on the Rule 23(a) requirements before Plaintiff has moved for class certification.

### 2.     *Plaintiff's Claims Also Satisfy Rule 23(b) at This Stage.*

Rule 23(b)(3) provides that a class action can be maintained if "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class is superior to other methods for fairly and efficiently adjudicating the controversy." "The Rule 23(b)(3) predominance inquiry tests whether proposed

classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,*

*Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Therefore, Rule 23(b)(3) "is similar to but 'more

stringent' than the commonality requirement of Rule 23(a)." *Thorn v. Jefferson-Pilot Life Ins.*

*Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (quoting *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146

(4th Cir. 2001)). Thus, every issue need not be common to all class members, but rather the

common issues must predominate over the individual ones.

Defendants contend that because Plaintiffs cannot satisfy the commonality requirements

of Rule 23(a)(2), they likewise cannot satisfy the more stringent predominance requirements.

(Defs. Reply at 13.) However, the Court finds its analysis regarding the commonality of the

putative class members claims applicable to the predominance inquiry at this stage. As stated,

based solely on the allegations in Plaintiff's Complaint, the issues regarding liability prove both

common to the proposed class and predominate over other questions, making a class action a fair

and efficient method of adjudicating this controversy. Again, at this pre-discovery stage, the

Court cannot definitively determine whether the questions of commonality and predominance are

satisfied given the dearth of information regarding the different experiences of the residents of

Pod 5G.

Defendants also make arguments regarding the superiority requirement, noting that other

inmates might want to pursue their causes of action outside of this Court (such as in state court

where they might recover higher damages), and that other mechanisms of adjudicating this case,

such as consolidation under Rule 42, might prove more judicially efficient. "In determining

whether the class mechanism is truly superior, the court should consider '(1) the interest in

controlling individual prosecutions; (2) the existence of other related litigation; (3) the

desirability of concentrating the litigation in the forum; and (4) manageability.'" *Soutter v.*

*Equifax Info. Servs., LLC*, 307 F.R.D. 183, 217-18 (E.D. Va. 2015) (quoting *Hewlett v. Premier Salons Intl, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997); Fed. R. Civ. P. 23(b)(3)). Put differently, the superiority requirement requires the Court to consider alternatives to class action litigation to determine "whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." *Stillmock v. Weis Mkts., Inc.*, 485 F. App'x 267, 274 (4th Cir. 2010) (internal quotations omitted).

Again, for the same reasons stated above, the Court has little reason at this point to believe that adjudicating this case through another mechanism would be more desirable or efficient. Plaintiff's allegations establish that a large group of individuals endured the same event and that their claims center on essentially the same constitutional violation. Moreover, as noted by Plaintiff, "many of these inmates remain incarcerated and would have substantial difficulties bringing individual actions on their own." (Pl.'s Resp. at 23.) Defendants have not offered concrete evidence that any of the potential class members have given any indication that they would like to pursue their claims independently. Indeed, they have only mentioned eight individuals who have indicated their interest in pursuing a claim, but, as Plaintiff indicates, these individuals have expressed their interest in joining in *this* action. (Pl.'s Resp. at 23.) Therefore, the Court cannot yet conclude that the class mechanism does not constitute a superior method of adjudicating this controversy.

For these reasons, the Court finds the dismissal of Plaintiff's class action allegations inappropriate at this early stage of these proceedings.

## IV.   CONCLUSION

For the reasons set forth above, the Court hereby GRANTS IN PART AND DENIES IN PART the Identified Defendants' Motion to Dismiss (ECF No. 10).  Specifically, the Court DENIES Defendants' Motion as to Count Two, but GRANTS Defendants' Motion as to Count One based on Plaintiff's concession that he has failed to state a claim.  Therefore, the Court DISMISSES WITHOUT PREJUDICE Count One of the Complaint.

An appropriate order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  May 5, 2021